UNITED STATES DISTRICT COURT
DISTRICT OF SOUTH DAKOTA
WESTERN DIVISION

IN THE MATTER OF THE SEARCH RE:

CASE NUMBER:  5:18-mj-33

18-024-04

**AFFIDAVIT IN SUPPORT OF
SEARCH WARRANT
APPLICATION "REDACTED"**

STATE OF SOUTH DAKOTA    )
                                                    :SS
COUNTY OF MINNEHHA        )

I, Brett Dickerson, being first duly sworn, hereby depose and state as follows:

## INTRODUCTION AND AGENT BACKGROUND

1.       I make this affidavit in support of an application for a warrant to search the

premises described as:

    A.    a residence and home office located at ██████████, Bradenton, Florida
        34208 (Bradenton Property");

    B.    a commercial property located at ██████████, Venice,
        Florida 34292 ("Venice Property");

    C.    a commercial property located at ██████████, Rapid City, South
        Dakota 57702 ("Rapid City Property");

    D.    a commercial property located at ██████████, Tappen,
        Longitude: ██████████ by Latitude ██████████, North Dakota 58487
        (Tappen Property);

as further described in Attachment A, for the items described in Attachment B.

2.       This affidavit or a similar affidavit is submitted in support of search warrants in

three judicial districts:  the District of South Dakota, District of North Dakota, and the Middle

District of Florida.  Although the affidavit contains information pertaining to all of the

properties, Attachment A is tailored to the property/ies sought to be searched in each district.

3.      I am a Special Agent of the U.S. Department of Agriculture (USDA), Office of Inspector General (OIG), and have completed the Criminal Investigator's Training Program at the Federal Law Enforcement Training Center (FLETC) in Glynco, Georgia.  I have over 23 years of federal law enforcement experience, the last 11 years of which has been as an OIG agent investigating violations of federal criminal law in white collar fraud, health care fraud, and general crimes.  I have gained experience through training, seminars, classes, and everyday work related to these types of investigations.  As a Special Agent with the USDA-OIG, I am a sworn federal law enforcement officer as provided by the Agriculture and Food Act of 1981 (Public Law 97-98), and the Inspector General Act of 1978.  As such, I am authorized to conduct investigations, carry firearms, and execute and serve warrants issued under the authority of the United States.  Based on my training and experience, I am familiar with the techniques used by persons who are engaged in fraudulent and other related criminal activity.  In particular, many of the facts included in this affidavit have been provided to me by USDA-OIG Special Agent Daniel Hudson.

4.      The information contained within this affidavit is based on my training and experience, as well as information I have developed and information related to me by other law enforcement officers.  Because this affidavit is being submitted for the limited purpose of securing a search warrant, I have not included each and every fact known to me concerning this investigation.  This affidavit is made in support of an application for a search warrant to search the location more fully described in Attachment A, attached hereto and incorporated by reference.  I have set forth only those facts I believe are necessary to establish probable cause to seize instrumentalities, fruits and evidence of violations of 18 U.S.C. § 1343, 18 U.S.C. § 1956, and 18 U.S.C. § 1957, more fully described in Attachment B, attached hereto and incorporated

herein by reference.

5.     Since June of 2017, USDA-OIG Special Agent Daniel T. Hudson has been investigating what appears to be a scheme to defraud companies that purchase organic commodities such as canola meal and flax meal for re-sale.  The investigation, as detailed below, has revealed that Kent Anderson and Michelle Gregoire have been purchasing conventional commodities primarily, from Cargill and Archer Daniels Midland (ADM), under the business name of Bar Two Bar Ranch, LLC, shipping them to one of their facilities, and reselling the same commodities as organic using other company names.  In summary, this affidavit sets forth facts establishing probable cause that evidence, fruits, and instrumentalities of this violation will be located in one dual residence/offices – the Bradenton, Florida Property – and three commercial locations:  the Venice, Florida Property; the Rapid City, South Dakota Property; and the Tappen, North Dakota Property.

## RELEVANT STATUTES

6.     The application for a search warrant, which this affidavit is offered in support thereof, is being applied for to seize instrumentalities, fruits and evidence, more particularly described in Attachment B, for violations of:

a.     18 U.S.C. § 1343, which makes it a crime to engage in a scheme or artifice to defraud another, and obtain the money and property of another, by false and fraudulent pretenses, that involves a wire transmission in interstate or foreign commerce for the purpose of executing the scheme or artifice;

b.     18 U.S.C. § 1956, which makes it a crime to conceal or disguise the nature, the location, the source, the ownership, or the control of the proceeds of specified unlawful activity, which in this case would be violations of 18 U.S.C. § 1343; and

c.     18 U.S.C. § 1957, which make it a crime to engage in in monetary transactions in criminally derived property of a value greater than $10,000, with proceeds derived from specified unlawful activity, which in this case would be violations of 18 U.S.C. § 1343.

[3]

## BACKGROUND OF USDA'S ORGANIC PROGRAM

7.      The USDA National Organic Program (NOP) was created in 1990 by the Organic Foods Production Act of 1990, 7 U.S.C. §§ 6501-6522 (the "Act"), to regulate the organic agriculture industry.  The NOP develops, implements, and administers national production, handling, and labeling standards for organic agriculture products.  The NOP also accredits the certifying agents who inspect organic production and handling operations to certify that they meet USDA standards.  The NOP is a marketing program housed within the USDA Agricultural Marketing Service.

8.      The Act, under Section 202.100-101, requires that, with limited exceptions, a production or handling operation, or specific portion of a production or handling operation, that produces or handles crops, livestock, livestock products, or other agricultural products that are intended to be sold, labeled, or represented as "100 percent organic," "organic," or "made with organic (specified ingredients or food group(s))" must be certified according to the provisions in the Act.

9.      The Act states, under Section 202.400-404, that a person seeking certification of a production or handling operation must submit an application for certification to a certifying agent and must follow the procedures listed and described in the Act.

10.      A public database is maintained by NOP that lists entities and their certificate status.  The database is searchable by entity, name, and type of certificate.  The website also provides the status of each respective certificate to include in good standing or revocation.

## KENT ANDERSON AND BUSINESS ENTITIES

11.      Kent Anderson is the owner of Bar Two Bar Ranch, LLC (B2BR) Spearfish, South Dakota, formed on February 7, 2005.  Kent Anderson is also the listed agent for B2BR.

[4]

B2BR is registered with the South Dakota Secretary of State and is currently listed as delinquent for failing to file an annual report. On or around August, 2016, B2BR was certified by the United States Department of Agriculture (USDA) in accordance with 7 C.F.R. Part 205, National Organic Program (NOP), as a "Handler" for Flax (Linseed) and Canola seed, oil, and meal, as well as barley, oats, peas, lentils, rye, wheat, and durum, and was provided NOP ID 6240025925. However, B2BR surrendered its NOP Handler Certificate on February 1, 2017. B2BR facilitated purchases of commodities from suppliers and provided those commodities to one of Anderson's other companies for marketing and resale. According to representatives of Archer Daniels Midland (ADM), one of Anderson's major suppliers, B2BR has purchased approximately 20,000 tons of conventional commodities a year from ADM since 2012. After the commodities were purchased from commodity suppliers, such as ADM, they were transported to facilities owned or controlled by Anderson, primarily in Tappen, North Dakota.

12.     After commodities were purchased by B2BR, Anderson used other companies he owns to facilitate the sales of the allegedly organic commodities to various customers throughout the United States. Other companies owned by Anderson that have also been involved in business transactions for organic products include: Green Leaf Trading, LLC, (GLT), Green Leaf Commodities, LLC (GLC), Green Leaf Oils, LLC (GLO), Green Leaf Resources, LLC (GLR) and Green Leaf Industries (GLI), collectively known as Green Leaf. All Green Leaf companies are registered with the Secretary of State in South Dakota and were registered in South Dakota on November 13, 2008. Although registered in South Dakota, Green Leaf Trading and Green Leaf Industries have used the addresses in Venice, Florida, for nearly 14 years.

13.     Of all of the Green Leaf companies, only Green Leaf Trading (GLT) held an Organic Certification. NOP ID 3920897988 was issued to Green Leaf Trading on September 22,

[5]

2010, in accordance with 7 C.F.R. Part 205, National Organic Program, as a Handler of organic commodities. However, GLT's NOP Organic Certification was revoked on September 16, 2015, after a complaint in 2014 of alleged misconduct by a grain broker (described in more detail below). The revocation of GLT's Organic Certification included not only Green Leaf Trading, but anyone associated with the entity, which included: Kent Anderson and Michele Heckel, Kent Anderson's sister-in-law.

14.   The last company connected to Kent Anderson is Dakota AG. Dakota AG was formed on October 12, 2016, and registered with the Florida Secretary of State. Kent Anderson's wife, Aimee Anderson, is listed as the organizer, and the company is managed by Michele Gregoire, Kent Anderson's sister-in-law, and formerly known as Michele Heckel. Dakota AG, LLC, currently holds an Organic Certification dated April 20, 2017, NOP ID 6220007456, and is located at ███████████████, Venice, Florida, the same address now used for Green Leaf Trading and Green Leaf Industries. Both Green Leaf entities are owned by Kent Anderson.

## DETAILS OF INVESTIGATION

15.   Since July 2017, this case has been investigated by USDA/Office of Inspector General (OIG)-Investigations. This investigation was initiated by the receipt of a complaint provided by a Cooperating Witness (CW) dated June 1, 2017. The identity of the CW is known to your Affiant. The CW provided a detailed complaint alleging Kent Anderson and Michelle Gregoire were purchasing conventional commodities primarily, from Cargill and Archer Daniels Midland (ADM), under the B2BR name, shipping them to one of their facilities, and reselling the same commodities as organic using the Green Leaf company names. These commodities were subsequently purchased by customers throughout the United States at an inflated price.

[6]

Invoices indicated the products were sold as organic under the Green Leaf names. The CW had evidence in the CW's possession that included inventories, wire transfers, financial documents, and invoices to Green Leaf customers that the CW acquired during the course of the CW's employment with Green Leaf. The CW stated that the documentation the CW provided was information created in the course of the CW's duties or had access to while employed at Green Leaf. The CW said that all of the invoices to Green Leaf customers identified each respective commodity purchased by the customer as being organic. Commodities included, but were not limited to, Canola Meal, Flax Meal (Linseed Meal), Soy Meal, and Sunflower Meal.

16.     In addition to the information from the CW regarding a 2014 NOP investigation, Special Agent Daniel Hudson obtained and reviewed records from the NOP. Those records revealed that on or about January 17, 2014, NOP received a complaint from All Star Trading (AST) that claimed Green Leaf received a load of conventional flax meal via truck and ultimately sold the same commodity to the AST as organic flax meal. NOP initiated an investigation and interviewed Daniel Krummen, owner of Krummen Trucking. Krummen was the individual that contacted AST regarding the load he hauled to GLC's, Tappen, North Dakota facility. In that interview, Mr. Krummen said that in January 2014, he had picked up a load of conventional flax prior to going to Green Leaf's Tappen Property. He was scheduled to deliver the load to the Tappen Property the same day he picked up organic flax for AST. When he arrived at the Tappen Property, instead of unloading the conventional flax, which was the standard practice, the workers at the Tappen Property told him not to empty his truck. The workers then topped off the load in his truck with more flax and signed his clean truck affidavit. Mr. Krummen delivered the flax to AST customers in Wisconsin as organic flax.

17.     NOP officials interviewed Anderson regarding the allegation.  Anderson told the NOP Officials that the Tappen, North Dakota, location was the only storage facility Green Leaf utilized.  Anderson said he had very little to do with the organic operations concerning Green Leaf.  Anderson told NOP officials that one Green Leaf employee quit after he learned of the investigation.  Anderson told NOP officials that another employee, Michele Heckel, would be terminated.  NOP issued a subpoena for information from Green Leaf regarding all purchases, sales, and other transactions.  However, Green Leaf did not provide the documents requested by NOP.  Thereafter, the NOP issued a Notice of Proposed Revocation to Green Leaf dated August 3, 2015.  According to the Revocation Certificate issued to Anderson by the NOP, "Revocation lasts for a period of five years from the date of revocation and extends to any person responsibly connected, including you."  The revocation issued to Anderson was dated September 16, 2015 that made Anderson or any responsible party ineligible to receive organic certification until September 16, 2020, pursuant to 7 CFR § 205.103.

18.     Another complaint regarding Green Leaf was filed on May 16, 2017, by SCS Global Services (SCS), of Emeryville, California, an organic certification company.  SCS, as part of an annual certification review, obtained evidence of non-compliance regarding the Green Leaf Rapid City Property.  Faye Litzinger, SCS Technical Associate for the Organic Program, told Special Agent Daniel Hudson that Green Leaf does not need an organic certificate to handle material as long as the material stays in the same packaging.  Litzinger said that Green Leaf would load and unload totes or other storage devices simply as a transfer point.  SCS found evidence, however, that Green Leaf was actually unloading product from the original packaging and placing it into one of their bins, and reloading it later, which was a violation pursuant to NOP § 205.101 (b)(1).  The review concluded that product consigned to the Green Leaf Rapid

City Location was packaged in 2000-pound totes, and 60,000 pounds had been unloaded from the totes and transferred into a hopper at the Green Leaf Rapid City Property. On October 16, 2016, the product total, 59,920 pounds, was delivered by full truckload, instead of totes, to the final destination. Therefore, the product had been removed from the original packaging, placed into a holding bin, and then reloaded on to a truck. SCS noted that at that time, Green Leaf was not certified organic and was not operating in compliance with NOP § 205.101 (b)(1). On March 15, 2017, Michele Gregoire responded to the affected customer, TYR foods, and stated that the product was placed in an area called Bin 37 and never was close to Bin 52. Special Agent Daniel Hudson has only observed three bins at the Rapid City Property. Between October 31, 2017, and November 1, 2017, Special Agent Daniel Hudson surveilled the Rapid City Property and observed that there were three external bins visible on the property. Also on the property was a semi-trailer and auger for loading product. There was a tandem dump truck loaded with a commodity visible through an open door, parked in one of the garage bays at the Rapid City Property.

19. On September 20, 2017, Special Agent Daniel Hudson met with the CW. The CW provided Special Agent Daniel Hudson a server backup and storage device containing numerous files from GLT dating 2012 through 2014. These files included, but are not limited to:

- Limited Emails
- Invoices
- Accounting Data
- Bin and Location Inventories
- Bank Statements
- Wire Transfers
- Photographs
- Meeting Notes

The storage device had been in the possession of the CW since hired by Green Leaf in January

[9]

2013.  The CW said that many of the documents on the device were created by the CW as part of his employment duties with Green Leaf.  The documents were typically financial in nature as it was the CW's job to take care of all finance and inventory operations for Green Leaf.  The CW said the device was necessary as some of the work the CW conducted could be at remote locations or from the CW's residence.

## OTHER ACTIVITY

20.      Special Agent Daniel Hudson learned that in 2006, the North Dakota Public Service Commission issued an Ex Parte Cease and Desist order to Anderson while he was doing business as Aspen Leaf Organic Farms.  Aspen Leaf Organic Farms was formed on or around 2004 and used the address of ████████████████, Spearfish, South Dakota.  This address is the same address for Bar Two Bar Ranch, LLC, owned by Kent Anderson.  The South Dakota Secretary of State does not have a record for Aspen Leaf Organic Farms.  Kent Anderson, operating a business under the name Aspen Leaf Organic Farms, was acting as a roving grain buyer without a license.  The complaint stated that Anderson had directly purchased organic crops from several producers in North Dakota.  The complaint further stated that Anderson either did not pay or wrote checks with insufficient funds to some of these producers.  Furthermore, the complaint stated that Anderson had been operating in North Dakota without the proper broker's license.  According to these records, Anderson was served legal documents on multiple occasions.  According to Anderson's criminal history, he was arrested on October 2, 2006 by the Lawrence County Sheriff's Department, South Dakota, on the charge of Fugitive from Justice.  That charge was dismissed.  According to court records from Stark County, North Dakota, Anderson was ultimately charged and plead guilty to Issuing Checks Without Sufficient Funds totaling $4,561.25, a Class C Felony.  According to Stark County court records, on October 4,

2006, Anderson was ordered to pay a $325 fee and place on unsupervised probation.

## RECENT ACTIVITY

21.     On November 20, 2017, Special Agent Daniel Hudson spoke with Lynne Benson, Senior Paralegal, Cargill.  Benson provided Special Agent Daniel Hudson settlement sheets between B2BR and Cargill dating from April 2012 through January 2015.  The summary sheets provided by Cargill included total B2BR purchase amounts by month for the date range.  That total was $11,806,686.70 in purchases of conventional commodities.  Benson confirmed that at no time did Cargill ever sell organic commodities to Anderson, B2BR, or any other Green Leaf entities.

22.     On December 7, 2017, Special Agent Daniel Hudson spoke with ADM Commercial Manager John O'Donnell and ADM General Counsel Fred Kenney.  O'Donnell confirmed Anderson, B2BR, or other Green Leaf entities have only purchased conventional commodities from ADM.  O'Donnell said that the ADM facilities of which Anderson conducts business do not sell organic and do not even have a SKU number available to sell organic commodities.  O'Donnell said that ADM has never sold organic commodities to Anderson, B2BR, or other Green Leaf entities.  O'Donnell said loads for Anderson are picked up by a contract trucking company hired by Anderson at three ADM locations:

1.     Redwing, Minnesota

2.     Enderlin, North Dakota

3.     Velva, North Dakota

O'Donnell said ADM has on rare occasions, delivered commodities for Anderson.  O'Donnell stated that the majority of commodities, based on the Bills of Lading (BOL) had been destined for Tappen, North Dakota.  Other locations identified by ADM where product has been sent are:

1.  Box Elder, South Dakota

2.  New Underwood, South Dakota

3.  Blackhawk, South Dakota

Anderson had purchased approximately 20,000 tons of conventional Canola Meal from ADM

annually since 2012 at an average price of $315/ton for five years, totaling $31,500,000.

According to Green Leaf invoices, GLC had sold that conventional product as organic for

approximately $500/ton for a total of $50,000,000.  That left Anderson a potential profit of

$18,500,000 for just canola meal from ADM.  Special Agent Daniel Hudson reviewed several

Green Leaf records received from the CW and learned that Anderson had also purchased other

conventional commodities and ultimately re-sold them as organic.  These other conventional

commodities from ADM and Cargill are Flax (Linseed) Meal, and Sunflower Meal.  Special

Agent Daniel Hudson knows, from reviewing Green Leaf bank account records, that numerous

wire transfers from Green Leaf accounts to ADM and Cargill occurred on a monthly basis.

Furthermore, deposits from Green Leaf customers entered the Green Leaf bank accounts and

were withdrawn or transferred back to the B2BR and other accounts.  These transactions

occurred after customers paid Green Leaf for what was presumed to be organic commodities.

## CARGILL SHIPMENTS

23.     Between September 2017 and January 2018, Special Agent Daniel Hudson

analyzed the data provided by the CW.  The information provided by the CW included bin

inventories from several of Green Leaf's storage locations.  The inventories identified load

numbers, incoming loads, outgoing loads, bin numbers where loads were delivered, and

customer information.  Bank information provided by the CW included statements from two

different financial institutions.  Anderson conducted wire transfers to pay Cargill for the

[12]

conventional commodities.  The bank information included those wire transfers for part of 2012, 2013, and part of 2014.

## COMPARISON OF RECORDS

24.     Special Agent Daniel Hudson compared records from Cargill with records from B2BR provided by the CW.  Cargill officials told Special Agent Daniel Hudson that they have only ever sold conventional canola meal to B2BR.  Each Cargill record is known as a settlement sheet. Settlement sheets provided by Cargill have load numbers as well as the shipping destination for each load.  According to the settlement sheets, Anderson paid $315 per ton to Cargill for conventional canola meal.  One example is a sale of approximately 26 tons of conventional canola meal to B2BR on November 9, 2013, for $315 per ton and shipped to Tappen, North Dakota.  Green Leaf resold the conventional canola meal as organic canola meal for $500 per ton to unsuspecting customers.  A review of Cargill records indicate load number 215316, originating from Cargill, West Fargo, North Dakota, containing approximately 26 tons of conventional canola meal was sold to B2BR and destined for Tappen, North Dakota totaling $8,297.32. Green Leaf inventory records indicated that on November 11, 2013, load number 215316 was delivered to Tappen, North Dakota and placed in bin #26.  The Green Leaf bin inventory records indicate 35 tons of organic canola meal from bin #26 outgoing to WE (Wilbur Ellis).  Furthermore, a review of GLC customer invoices provided by the CW indicated that on November 14, 2013, GLC sent WE invoice number WE-842, for the purchase of approximately 35 tons of organic canola meal totaling $17,900.00.  This transaction was a GLC profit of $9,602.68.  According to the GLC invoice, this purchase was part of contract number 20170 between GLC and WE for 1500 tons organic canola meal at the rate of $500 per ton.  The table below indicates this and similar sales:

[13]

## CANOLA MEAL PURCHASED FROM CARGILL

| Purchased B2BR Conventional Shipped from Cargill | | | Received Tappen | | | Resold As Organic by GLC | |
|---|---|---|---|---|---|---|---|
| **11-09-13 ORGIN** Cargill, West Fargo, ND purchased by Bar Two Bar | **Canola Meal** $315/ton | Load # 215316 | **11-11-13 DESTINATION** Green Leaf Tappen, ND | Load # 215316 (same) | **Organic Canola Meal** Bin #26 | **14-14-13 RE-SOLD** Invoice WE-842 From Green Leaf to Wilbur Ellis | **Organic Canola Meal** from Bin #26 $500/ton Or .25 per pound |
| | | | | | | Contract 20170 | |
| **11-21-13 ORGIN** Cargill, West Fargo, ND purchased by Bar Two Bar | **Canola Meal** $315/ton | Load # 141887 | **11-21-13 DESTINATION** Green Leaf Tappen, ND | Load # 141887 (same) | **Organic Canola Meal** Bin #35 | **11-26-13 RE-SOLD** Invoice ARA-462 from Green Leaf to American River Ag | **Organic Canola Meal** from Bin #35 $500/ton or .25 per pound |
| | | | | | | Contract 20171 | |
| **12-23-13 ORGIN** Cargill West Fargo, ND purchased by Bar Two Bar | **Canola Meal** $315/ton | Load # 65534 | **12-23-13 DESTINATION** Green Leaf Tappen, ND | Load # 655334 (same) | **Organic Canola Meal** Bin #26 | **12-30-13 RE-SOLD** Invoices WE-883 ARA-480 from Green Leaf to Wilbur Ellis and American River Ag | **Organic Canola Meal** from Bin #26 $500/ton or .25 per pound |
| | | | | | | **Contracts** 20368 20364 | |
| **03-06-14 ORGIN** Cargill West Fargo, ND purchased by Bar Two Bar | **Canola Meal** $320/ton | Load # 645368 | **03-07-14 DESTINATION** Green Leaf Tappen, ND | Load # 645368 (same) | **Organic Canola Meal** Bin #25 | **03-11-14 03-12-14 RE-SOLD** Invoice WE-967 WE-968 WE-970 | **Organic Canola Meal** From Bin #25 $500/ton or .25 per pound |
| | | | | | | Contract 20194 | |

[14]

25.     The CW provided bank statements for GLC and B2BR that the CW acquired during the time of the CW's employment at GLC. Special Agent Daniel Hudson reviewed the 2013 B2BR bank account numbers ▅▅▅ and ▅▅▅ from Dacotah Bank, Rapid City, South Dakota. The review identified several wire transfers from B2BR to ADM and Cargill. For the months of January 2013 through April 2013, B2BR conducted several wire transfers totaling over $600,000.00. Nearly all of the wire transfers contained hand written notes from bank personnel that stated "Per Kent Anderson phone call" or "Per Kent Anderson." These wire transfers were primarily from B2BR to ADM and Cargill. Officials from ADM and Cargill told Special Agent Daniel Hudson that they have never sold organic commodities to B2BR. Special Agent Daniel Hudson reviewed  GLC bank account ▅▅▅ from Dacotah Bank, Rapid City, South Dakota and account ▅▅▅ from Chase. This review revealed that GLC wired approximately $719,000.00 back to B2BR after commodities were marketed as organic and sold by GLC.

### Money Laundering

26.     Title 18, United States Code, Section 1956 provides that:

> (a)(1) Whoever, knowing that the property involved in a financial transaction represents the proceeds of some form of unlawful activity, conducts or attempts to conduct such a financial transaction which in fact involves the proceeds of specified unlawful activity
>
> (A)(i) with the intent to promote the carrying on of specified unlawful activity; or
>
> (B) knowing that the transaction is designed in whole or in part -- (i) to conceal or disguise the nature, the location, the source, the ownership, or the control of the proceeds of specified unlawful activity; or (ii) to avoid a transaction reporting requirement under State or Federal law,
>
> shall be sentenced to a fine of not more than $500,000 or twice the value of the property involved in the transaction, whichever is greater, or imprisonment for not more than twenty years, or both.

27.     The term "knowing that the property involved in a financial transaction represents the proceeds of some form of unlawful activity" as defined pursuant to Title 18, United States Code, Section 1956(c)(1), means that the person knew the property involved in the transaction represented proceeds from some form, though not necessarily which form, of activity that constitutes a felony under State, Federal, or foreign law, regardless of whether or not such activity is a specified unlawful activity.

28.     The term "conducts" as defined pursuant to Title 18, United States Code, Section 1956(c)(2), includes initiating, concluding, or participating in initiating, or concluding a transaction.

29.     The term "transaction" as defined pursuant to Title 18, United States Code, Section 1956(c)(3), includes a purchase, sale, loan, pledge, gift, transfer, delivery, or other disposition, and with respect to a financial institution includes a deposit, withdrawal, transfer between accounts, exchange or currency, loan, extension of credit, purchase or sale of any stock, bond, certificate of deposit, or other monetary instrument, use of a safe deposit box, or any other payment, transfer, or delivery by, through, or to a financial institution, by whatever means effected.

30.     The term "financial transaction" as defined pursuant to Title 18, United States Code, Section 1956(c)(4), includes a transaction which in any way or degree affects interstate or foreign commerce and involving the movement of funds by wire or other means, or a transaction involving the use of a financial institution which is engaged in, or the activities of which affect, interstate or foreign commerce in any way or degree.

31.     The term "monetary instruments" as defined pursuant to Title 18, United States Code, Section 1956(c)(5), means coin or currency of the United States, or of any other country,

travelers' checks, personal checks, bank checks, and money orders, or investment securities or negotiable instruments, in bearer form or otherwise in such form that title thereto passes upon delivery.

32.     The term "financial institution" as defined pursuant to Title 18, United States Code, Section 1956(c)(6), includes any financial institution, as further defined in section 5312(a)(2) of Title 31, United States Code, which includes a currency exchange, a broker or dealer in securities or commodities, and a dealer in precious metals.

33.     The term "specified unlawful activity" as defined pursuant to Title 18, United States Code, section 1956(c)(7), which incorporates Title 18, United States Code, section 1961(1), includes wire fraud, or any scheme or attempt to defraud, in violation of Title 18, United States Code, sections 1343.

## EVIDENCE OF MONEY LAUNDERING

34.     Special Agent Daniel Hudson reviewed bank statements at Chase Bank and Dakotah Bank for Bar Two Bar Ranch and several Green Leaf entities (including Green Leaf Commodities, Green Leaf Resources, Green Leaf Trading and Green Leaf Industries), hereafter referred to as "Green Leaf," as well as bank statements for personal accounts held in the name of Aimee and Kent Anderson.

## CASH

35.     Between January of 2013 and December of 2017, Green Leaf and Bar Two Bar Ranch purchased $43.8 million worth of grain to resell.  $42.7 million worth of the grain came from grain dealers who sell *only conventional* (non-organic) grain.  During this same time period, Green Leaf and Bar Two Bar Ranch represented themselves as organic companies that sold grain labeled "organic" and received $73 million.  Of this amount, $13.7 million was then

[17]

transferred into Kent and Aimee's personal bank accounts ($5.67 million into a savings account at Chase, $7.6 million into a personal checking account at Chase, and $255,000 into a personal account at Dakotah Bank).  In addition to deposits related directly to their organic grain businesses, Kent and Aimee had $329,191.55 in deposits which could not be tied directly to the business ($20,000 in rent from Michelle Heckel/Gregoire, $20,000 from Duane and Janis Anderson, $19,191.55 from Candice Pringle and $270,000 from Black Hills Title and Abstract). During this same time, $142,474.31 was withdrawn from Kent and Aimee's personal checking accounts in cash.

**JEWELRY/HANDBAGS**

36.     Between January of 2013 and December of 2017, the bank records from Chase Bank and Dakotah Bank revealed that $451,796.67 was spent on jewelry and handbags/luggage. This includes $242,796.67 via bank card transactions and wire transfers drawn on Kent and Aimee's personal checking account at Chase ($23,350 in bank card purchases from Bliss Jewelers in St. Thomas; $15,096.38 in bank card purchases from Chanel (which sells high end handbags and jewelry); $19,336.54 in bank card purchases from Louis Vuitton (a company selling  high end handbags and luggage); $11,515.40 bank card purchases from the Breitling Boutique (a watch company); $4,713.35 in bank card purchases from Old Northeast Jewelers; and $168,785 in wire transfers to Scintillating imports (a loose diamond/jewelry importer)).  It also includes $209,000 in jewelry purchases from Bliss Jewelers via ACH transfer from a Chase account in the name of Green Leaf Resources.

## LOCATIONS TO BE SEARCHED

**"Bradenton Property"**

37.    Kent Anderson and his wife Aimee Anderson reside at ▮▮▮▮▮▮▮▮,

Bradenton, Florida 34208 (the Bradenton Property).  According to the CW, the Bradenton

property is also Kent Anderson's home office.  The CW said that all of Anderson's business

transactions came from the Bradenton Property home office.  Records obtained from Chase bank

for accounts for Green Leaf Trading, Green Leaf Commodities, and Green Leaf Resources, from

April 2013 to present, each list the address of the Bradenton property.

38.    Between November 30, 2017, and December 30, 2017, a mail cover was

conducted on the Bradenton Property.  The mail cover revealed letters addressed to Kent

Anderson, Aimee Anderson, The Kent Anderson Family, and bank statements for Green Leaf

Industries were sent to the Bradenton property address.

39.    Surveillance of the Bradenton Property by law enforcement agents on or about

December 1, 2017, revealed a white Range Rover with South Dakota license plates was parked

in the driveway.  The license plates were issue to Green Leaf Industries, another of Anderson's

companies.

40.    Therefore, your affiant believes that evidence, fruits, and instrumentalities of wire

fraud, specifically but not limited to business records related to Anderson's businesses, would be

located at this location.

**"Tappen Property"**

41.    Green Leaf Industries owns and operates the facility located at 3▮▮▮▮▮▮

▮▮▮▮▮▮, Tappen, North Dakota 58487 ("the Tappen Property").  The company  was

registered in 2013 with the Farm Service Agency as Green Leaf Industries, ▮▮▮▮▮▮▮▮

▮▮, Spearfish, South Dakota 57783.  This address is one of Kent Anderson's former

[19]

residences.  At the Tappen, North Dakota location, Special Agent Daniel Hudson has observed a scale for weighing vehicles, a scale house building, and a secondary building with approximately 13 grain bins.  On November 28, 2017, Special Agent Daniel Hudson observed a red semi-truck hooked to a grain trailer near the scale.  "Bar Two Bar Ranch" was written on the door to the semi-truck.  On November 29, 2017, Special Agent Daniel Hudson witnessed a dark colored semi-truck trailer being loaded from one of the north bins at the Tappen Property.  The license on the trailer came back to KCS Trucking of Buchanan, North Dakota.  According to ADM Commercial Manager John O'Donnell, KCS is one of the primary trucking companies utilized by Anderson.

42.     The Tappen Property was the location of the 2014 NOP complaint that resulted in the revocation of Anderson's organic certificate.  ADM continues to sell conventional commodities to B2BR, as ordered by Anderson, and ships them, primarily, to the Tappen Property per Anderson's shipping instructions.

Therefore, your affiant believes that evidence, fruits, and instrumentalities of wire fraud, specifically but not limited to business records related to Anderson's businesses, would be located at the Tappen, North Dakota location.

**"Venice Property"**

43.     Green Leaf Resources currently conducts business at an office located at ▮▮▮ ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮, Venice, Florida 34292 ("the Venice Property").  When the CW worked for Green Leaf in 2012, the CW worked at an office located at 112 Commerce Drive.  The CW stated the office location moved after the CW left employment with Green Leaf.

44.     The CW identified the previous Venice Property as the location where the CW conducted business with Anderson and Michele Gregoire, formerly Michele Heckel.  The CW

[20]

said the previous Venice Property handled the organic certification, customer relations, and sales. The CW said Anderson worked from his home office and would transmit data to the CW at the previous Venice Property and said Anderson would visit the Venice property about once or twice per month. The CW said that all accounting and data would go through the previous Venice Property. All invoicing and payments by customers to would go to a nearby P.O. Box. However, the office changed locations and the P.O. Box not used afterwards.

45.     On or about December 1, 2017, law enforcement agents surveilled the Venice Property. Agents observed an individual speaking on a cell phone outside the business. That individual got into a vehicle registered to Ruben Miller. Agents identified Miller by his Florida driver's license photograph. Miller is listed as the Accounts Receivable contact on the Green Leaf Commodities website.

46.     Between November 30, 2017, and December 30, 2017, a mail cover was conducted on the Venice property. The mail cover revealed a limited amount of mail was delivered to the Venice Property. One piece of correspondence was addressed to Green Leaf Commodities in care of "Ruben" at the Venice Property address.

47.     The Florida Secretary of State lists Dakota Ag, a company owned by Aimee Anderson and managed by Michele Gregoire, as doing business at the current Venice Property address. Dakota Ag holds a current organic certificate from NOP. During the time of the Mail Cover, no U.S. mail addressed to Dakota AG was discovered at any of the addresses used by Green Leaf.

48.     Therefore, your Affiant believes that evidence, fruits, and instrumentalities of wire fraud, specifically but not limited to business records related to Anderson's businesses, would be located at Venice, Florida, location.

**"Rapid City Property"**

49.     The Rapid City Facility is located at ████████, Rapid City, South Dakota 57702 ("the Rapid City Property"). According to the website, ████████, Green Leaf Commodities is located at ████████, Rapid City, South Dakota.  Special Agent Daniel Hudson has conducted surveillance of the Rapid City Property and observed that it is a 10,000 square foot heated warehouse with two loading docks.  The warehouse building has office space, restrooms, a show room, and a sales counter.  The Rapid City Property uses ████████ ████, Spearfish, South Dakota as a mailing address.  The mailing address is a local UPS store.  Between November 30, 2017, and December 30, 2017, a separate mail cover captured mail sent to ████████, Spearfish, South Dakota, revealed receipt of mail addressed to Kent Anderson, Aimee Anderson, Bar 2 Bar Ranch, Aspen Leaf Organic Farms, Michelle Gregoire, Green Leaf Commodities, Green Leaf Resources, and Green Leaf Industries has been received at this address.

50.     According to the South Dakota Secretary of State, Anderson owns GLC and Gregoire is the manager.  The GLC website lists Michele Gregoire as President of GLC.  Ruben Miller is listed as Accounts Receivable, and Joe Routh is listed as the Plant Manager.  All of the individuals have we-got-oil email addresses and South Dakota area code telephone contact numbers. According to the GLC website:

*"Green Leaf Commodities, LLC specializes in Flax and Sunflower Products.  Our activities include oil extraction, seed cleaning, milling, trading and packaging.  Facilities utilize cold pressed machinery and we never use solvents.  This process helps maintain the integrity of the oil components, specifically omega fatty acids and renders a natural product with increased shelf life.  We make use of third party lab testing to evaluate the quality of oils and meals that*

[22]

*are produced."*

The GLC website also discusses the health benefits of flax oil in human consumption. Green Leaf's Rapid City Property lists the following commodities available:

- Organic Flax

- Sunflower Meal

The Rapid City Facility was the subject of the 2017 NOP complaint regarding Green Leaf unloading totes and placing them in to bulk trailers. Green Leaf does not have an organic certificate. Between October 31, 2017 and November 1, 2017, Special Agent Daniel Hudson surveilled the Rapid City Property and observed three hopper bins on the side of the building. Special Agent Daniel Hudson observed a tandem dump truck loaded with a brown, grain like material. There was also a grain trailer and auger present on the property. None of the Green Leaf entities has an organic certificate.

51.     Your Affiant knows that individuals engaged in unlawful financial crimes often use vehicles as tools to conduct business and financial transactions. This business includes traveling between places of business, banks, meetings, and other facilities. Furthermore, devices such as laptop computers, cell phones, documents, and evidence of crime can be stored within the confines of a vehicle. Your Affiant requests permission to search any vehicle registered to any Green Leaf entity, Bar Two Bar, Kent Anderson, Aimee Anderson, Michelle Gregoire, and Ruben Miller, located on the curtilage of the associated properties.

## COMPUTER RELATED EVIDENCE

52.     It is the experience of the Affiant that businesses have computer devices at their different locations to record and conduct general business activities such as recording sales and expenses as well as the purchase and inventory control of products that are purchased are resold.

[23]

In addition, the computers are often used in preparation of general ledgers and other such bookkeeping records that businesses provide to bookkeepers and/or accountants for accounting record keeping purposes and tax return preparation.  The home or office is typically where computer devices are found during the execution of search warrants that this Affiant's Agency has executed.  Any computer system at the subject property would likely contain evidence of the illicit business practices described herein.

53.     Green Leaf uses computers as part of its business operations, as evidenced by, among other things, a website describing the business,                              ; a listing on the website of relevant links to online resources; and email addresses on the website for Michele Gregoire, President, Ruben Miller, Accounts Receivable, Joe Routh, Plant Manager, Austin Anderson, Processing.  In addition, NOP informed Special Agent Daniel Hudson that it conducts its correspondence with Gregoire over the computer.  Special Agent Daniel Hudson has also reviewed email correspondence between Anderson and Gregoire that was provided by the CW regarding the business practices of Green Leaf and B2BR.  The practices include shipping, purchases, vendor information, inventories, and customer data as far back at 2010.  There are several emails between Gregoire and Wilbur Ellis, one of Green Leaf's largest customers, and other customers regarding ordering or complaints to the company.  Subsequently, there were emails between Gregoire and Anderson regarding those topics.

## RETURN AND REVIEW PROCEDURES

54.     Pursuant to Rule 41 of the Federal Rules of Criminal Procedure, I understand and will act in accordance with the following:

a.      Pursuant to Rule 41(e)(2)(A)(i), an agent is required to file with the court an inventory return, that is, an itemized list of the property seized, within fourteen (14) days of the execution of the warrant.

[24]

b.  Pursuant to Rule 41(e)(2)(B), Rule 41(e)(2)(A) governs the time within which the electronically stored information must be seized or copied on-site after the issuance of the warrant, not the later review of the media or information seized, or the later off-site digital copying of that media.

c.  Under Rule 41(f)(1)(B), the inventory return that is to be filed with the court may be limited to a description of the physical storage media that was seized or copied, not an itemization of the information or data stored on the physical storage media.  Under Rule 41(f)(1)(B), I may retain a copy of that information for purposes of the investigation. The government intends to make and retain a full image copy of the seized media, so that a copy of the evidence, rather than the original evidence, can be examined.

55.  Special Agent Daniel Hudson consulted with IT Specialist Vincent J. Castaldo, who has been engaged in computer forensic investigations for 18 years, assigned to his current position at the USDA-OIG Technical Crimes Division for the past 11 years.  IT Specialist Vincent J. Castaldo is specially trained in computer search and seizure and is certified as such. IT Specialist Vincent J. Castaldo is a member of the USDA-OIG Technical Crimes Division and has conducted numerous search and seizures involving computers, networks, cell phones and Digital Video Recorder (DVR) systems.  IT Specialist Vincent J. Castaldo has confirmed with Special Agent Daniel Hudson what is summarized in paragraphs below.

56.  Computer hardware, DVR devices, software, documentation, passwords, and data security devices may be important to a criminal investigation in two distinct respects:  (1) the items themselves may be instrumentalities, fruits, and/or evidence of crime; and /or (2) items may have been used to collect and store information about crimes (in the form of electronic data).  Thus, Rule 41 of the Federal Rules of Criminal Procedure permits the government to search and seize computer hardware, software, documentation, passwords, and data security devices, which are (1) instrumentalities, fruits and/or evidence of crime; and/or (2) storage devices for information about crimes.

[25]

57.     Based on this Affiant's knowledge, training, and experience, I know that searching and seizing information from computer-generated media, such as compact discs, often requires search by a qualified computer specialist in a laboratory or other controlled environment.  This is true because computer storage devices can store the equivalent of thousands of pages of information.  Additionally, a suspect may try to conceal evidence; he or she might also store it in random order with deceptive file names.  This may require searching authorities to examine all the stored data to determine which particular files is evidence or instrumentalities of crime.  This process may take weeks or months, depending on the volume of data stored, and often it would be impractical to attempt this kind of search on-site.

58.     Searching computers for criminal evidence is a highly technical process requiring expert skill in a properly controlled environment.  For example, on-site and laboratory analysis by a qualified computer specialist is often required in order to properly retrieve and analyze electronically stored (computer) data, to document and authenticate the data, and to prevent the loss of data.

59.     Based on the above facts, circumstances and information, permission is requested to image all computer systems, discs, or functionally- equivalent digital data storage devices (including computer systems and peripherals housing data storage capability), even though there may be unrelated information stored on them.  If the information on these devices cannot be imaged, then permission to seize them is requested.

## CONCLUSION

60.     Based upon my experience, all of the above factors have been indicative of violations of federal criminal laws, including 18 U.S.C. §§ 1343, wire fraud, 1956(a)(1)(B)(i), money laundering, and 1957, monetary transactions with criminally derived proceeds.

[26]

61.    I, therefore, respectfully request that the attached warrant be issued authorizing the search of the location specified in Attachment A and the seizure of the items described in Attachment B.

I declare under penalty of perjury that the foregoing is true and correct.


Brett Dickerson, Special Agent
U.S. Department of Agriculture, Office of
Inspector General


Sworn to before me and:   ☐ signed in my presence.
                          ☒ submitted, attested to, and acknowledged by reliable electronic means.
on this __9th__ day of March, 2018.


DANETA WOLLMANN
United States Magistrate Judge

[27]